HERSEY, Judge,
dissenting.
This is an appeal from an order granting a motion to suppress.
The incident giving rise to the charges against appellant occurred» on April 21, 1990, and involves Officer Robert Epstein, an employee of the Seminole Indian Reservation Department of Law Enforcement in Broward County. Officer Epstein had been so employed for more than four years, and for the two years preceding this incident he had been assigned as a road patrol police officer. During that period, according to his testimony at the motion hearing, he had made between 50 and 100 arrests involving various kinds of drugs.
The operative facts are portrayed by the following testimony of Officer Epstein elic: ited on direct examination by the prosecutor:
Q Directing your attention to April 21st of last year, did you come in contact with *1383 a person that later became known to you as Daniel Larcomb?
A Yes, I did.
Q How did you come into contact with him?
A He was a passenger in a vehicle that I stopped. Actually I didn’t stop it, but I was following.
I observed the vehicle that he was riding in to be weaving between the right lane and center lane. I also observed the tag light to be out. I didn’t turn my emergency lights on or anything, and the vehicle made a turn and made a stop in a parking area.
Q Why didn’t you turn your lights on?
A I hadn’t followed enough yet. In other words, I was going to make a stop for DUI, but I then hadn’t made a stop to really go ahead and do that yet.
Q About what time of day was this?
A It was evening, I believe. I know it was evening. It was dark. I don’t recall specifically what time it was.
Q It was dark?
A Yes, it was.
Q Or light?
A It was dark.
Q And where was this at, the location?
A He pulled into a parking area that was fairly-well lit with lights and everything. He pulled into the parking area of a restaurant north of Sheridan Street on west side of State Road 7.
Q. And what did you do at that time?
A. I thought this was kind of strange for him just to pull in without me activating lights or anything. I work in an unmarked car, so I don’t believe he realized it was a police car behind.
I stopped my car and pulled to the side of the road and I observed the vehicle through binoculars at that time. I wanted to see what they were doing there.
Q Approximately how far away were you?
A I would say 20 to 30 yards. Maybe not even that far. Maybe 20 yards.
THE COURT: What time was this?
THE WITNESS: It was early evening.
THE COURT: Daylight? Was it light out?
THE WITNESS: No, it was dark.
THE COURT: What day?
THE WITNESS: I don’t recall.
Q Would you like to reflesh [sic] your recollection?
A Yes, I would like to look at a copy of my probable cause recollection.
MR. FARNSWORTH: He hasn’t looked at a copy since he got here, only at deposition.
A Thank you. It would have been on the 21st of April, last year at 10:49 p.m. I can tell you specifically what day that was. That would have been a Saturday evening.
THE COURT: ’90.
THE WITNESS: That’s correct.
MR. FARNSWORTH: Yes.
Q And why were you observing this car at this time?
A I thought it was very strange for a car just to pull into an empty parking lot like that. I just wanted to see what they were doing.
Q Did this have anything to do with your suspicions to a DUI?
A Yes, it did. I was going to see if maybe they switched drivers, or something like that.
Q And what did you see occur?
A I observed the driver and Mr. Lar-comb exit the vehicle. In Mr. Larcomb’s hand I saw a clear bag. This was through my binoculars. At this point I thought the bag—
MR. SEITEL: Objection as to what he thought.
THE COURT: Overruled.
MR. FARNSWORTH: Goes to state of mind?
A I thought the bag could possibly contain narcotics. I then pulled in behind the vehicle Mr. Larcomb was in. As I did that, Mr. Larcomb reached inside the car, reached under the driver’s seat with his hand, and when he came out, his hand was empty.
Q Why did you think that that bag had anything to do with drugs?
*1384 A I have made numerous drug arrests.
Q How would you describe it?
A It was a small, clear plastic bag containing what looked to me to be like a white powder.
Q And have you experienced this in your duties?
A Many, many times. It is a very typical packaging for small amounts of narcotics.
Q How far away from him were you when you saw this bag?
A As I said, maybe 20 yards. I was observing through binoculars.
Q And did you get any closer to him than that?
A Yes, I did. I pulled right up behind his vehicle when I saw the bag.
Q And what did you do at this time?
A I observed Mr. Larcomb coming back in the car. I observed him stick his hand under the driver’s seat and at that point he came back out from under the driver’s seat. His hand was empty.
Q How far away were you from him when he got back into the car to put that underneath the seat?
A Not that far at all. I had just pulled up behind his vehicle. I guess he realized it was a police car at that point. Maybe ten feet.
Q Were you in uniform?
A Yes, I was.
Q But the car was unmarked; is that correct?
A That’s correct.
Q What did you do after you saw these actions by Mr. Larcomb?
A I looked under the seat and observed the bag with the powdery substance in it.
Q What was your intent, Officer, when you first pulled up there?
A Well, I noticed Mr. Larcomb with the bag of the powdery substance. Also my intent was to check the driver for drunk driving.
MR. SEITEL: We’re going to object to what his intent was. We think it’s irrelevant. We just want to know what he did.
THE COURT: Overruled. I’ll allow cross-examination.
A I wanted to further check the driver for signs of drunk driving.
Q What was the driver doing at this point?
A Standing there.
Q How far away?
A I really don’t recall. My attention was basically on the narcotics and Mr. Larcomb at that point.
Q Were there any other occupants in the vehicle?
A Yes, there was. There was another passenger in the right front seat.
THE COURT: Where were these people?
THE WITNESS: The driver and passenger — The driver and Mr. Larcomb had exited the vehicle. Mr. Larcomb was sitting in the back seat originally. The front right seat passenger I don’t believe had gotten out of the car as of yet, as I recall. After I saw the narcotics, my attention was really on Mr. Larcomb. I believe the right front-seat passenger was still in the car at this point.
Q So there was a total of three people that had been in the vehicle?
A That’s correct.
Q When you pulled up, two were out and one was still in?
A That’s correct. To the best of my recollection.
Q And after you had retrieved this bag from underneath his seat, what did you do then?
A At that point I asked the driver for his drivers license and I asked Mr. Lar-comb for his I.D. I ran the driver for a drivers license [check] to see if his drivers license was okay. On the teletype his license came back suspended and he was placed under arrest.
Q Why was he placed under arrest?
A Driving with a suspended drivers license.
Q Is that the only thing that you arrested him for?
A He was also charged with no tag light.
*1385 Q And what did you do with Mr. Lar-comb?
A At that point I believe I placed Mr. Larcomb under arrest for possession of a controlled substance.
Q And why was that? Did you test the substance?
A Yes, the narcotics was tested and it tested positive in a field test.
Cross-examination revealed that the clear plastic bag measured approximately one square inch or two square inches in size and that the officer did not see that the bag contained a white substance until he, himself, had retrieved it from under the automobile’s front seat.
It seems clear to me that a law enforcement officer with considerable experience in making drug-related arrests, who observes the occupant of an automobile hurriedly and furtively secrete an extremely small clear plastic bag under the seat of the automobile upon realizing that an officer is approaching, is justified in formulating in his own mind the probable cause to seek out that bag for further observation. What does a grown man in an automobile late at night carry around in a tiny clear plastic bag? If it is simply a nonprescription headache powder or some other innocuous substance, then why the sudden, furtive effort to hide it under the seat of the automobile? It would seem that any knowledgeable human being living in South Florida in this day and age, upon viewing such an occurrence, would come to the conclusion that drugs were involved. I venture to add the unsubstantiated estimate that such a conclusion would be right on the mark in nine out of ten instances. This is not possibility — suspicion—hunch— or whatever. It is probability, and it is rather strong probability. I therefore would reverse the order granting the motion to suppress. Accordingly, I respectfully dissent.